DIF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MANALISA WILLIAMS, o/b/o D.F.W.,

                Plaintiff,                       **MEMORANDUM & ORDER**

      -against-                                     14-CV-1403 (NGG)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
-------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Manalisa Williams ("Plaintiff") brings this action on behalf of her son, D.F.W. ("Claimant"), pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of a decision of the Social Security Administration (the "SSA") finding that Claimant is not disabled and therefore does not qualify for Supplemental Security Income ("SSI") benefits. (Compl. (Dkt. 1).) Defendant Carolyn W. Colvin, the Acting Commissioner of the SSA (the "Commissioner"), has filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s Not. of Mot. (Dkt. 18).) The court construes Plaintiff's September 28, 2014, letter as her cross-motion for judgment on the pleadings and opposition to the Commissioner's motion for judgment on the pleadings. (May 21, 2015, Order (Dkt. 14); Sept. 8, 2014, Pl.'s Ltr. (Dkt. 13).) For the reasons set forth below, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED, and this case is REMANDED to the SSA for further proceedings consistent with this Memorandum and Order.

**I.    BACKGROUND**

Claimant was born on June 5, 1998. (See Administrative R. ("R.") (Dkt. 8) at 78.) At the time of his final hearing before the Administrative Law Judge ("ALJ") on August 28, 2012,

1

Claimant was 14 years old and was set to begin ninth grade at the Boys and Girls High School. (See id. at 62.) He is now 18 years old.

### A. Medical Evidence

#### 1. Vision Issues

On October 9, 2005, Claimant went to Kings County Hospital Center ("Kings County") after being struck in the left eye with a rock propelled via slingshot. (See id. at 323-32.) Two days later, Dr. Jose Bernardo Quintos ("Dr. Quintos"), the attending physician at Kings County, diagnosed Claimant with a hyphema: pooling of blood inside the eye. (Id.)

On July 14, 2011, Dr. Neena Gadangi ("Dr. Gadangi"), a pediatrician, identified a pale optic nerve in Claimant's left eye. (Id. at 566.) Subsequently, on May 22, 2012, Dr. Robert L. Feig ("Dr. Feig"), a retinal specialist, found that Claimant had traumatic optic neuropathy to his left eye as a result of the slingshot incident, which had taken place seven years prior, and prescribed Alphagan P 0.1 percent. (Id. at 284.) On June 18, 2012, Dr. Andre Gray ("Dr. Gray"), a pediatrician, conducted a consultative pediatric examination of Claimant, and noted that a retinal specialist had found significant reduction in vision in the affected left eye, which led to Dr. Gray's diagnosis of decreased visual acuity secondary to trauma. (Id. at 400-04.) Dr. Gray described the prognosis for Claimant's eye as "guarded." (Id.)

#### 2. Asthma

Claimant was seen by Dr. Thomas DePaola ("Dr. DePaola"), who works in pediatrics, on May 6, 2011, for a consultative examination. (Id. at 373.) Dr. DePaola noted that Claimant had asthma, but had not experienced asthma-related problems for five years, making it possible that he had outgrown the condition. (Id.) On June 11, 2012, Dr. Sana Nejmeh-Khoury[1] ("Dr.

---

[1] Dr. Sana Nejmeh-Khoury is sometimes erroneously referred to as "Dr. Sana Khoury-Nejmeh" in the Record.

Nejmeh-Khoury"), a pediatrician, saw Claimant for a routine check-up and described Claimant's asthma as "stable." (See id. at 593.) On June 18, 2012, Dr. Gray found Claimant's asthma to be mild and intermittent. (See id. at 404.) However, he recommended that Claimant avoid known irritants—such as dust, cigarette smoke, and mold—in the future. (See id.)

### 3. Pes Planovalgus (Flat Feet)

Claimant underwent the first of his three foot surgeries after complaining of pain in both feet. (See id. at 362-64.) The surgery was performed on December 30, 2010, by Dr. Ovidio Falcone ("Dr. Falcone"), Director of Podiatric Surgery at Interfaith Medical Center, to correct Claimant's flat foot deformity on the left foot. (Id.) At the time, the surgery was deemed a success. (Id.) That Spring, Dr. Falcone performed the same procedure on Claimant's right foot. (See id. at 357-58.) Six weeks after this second surgery, the New York State Office of Temporary and Disability Assistance Division of Disability Determinations provided Dr. Falcone with forms to determine Claimant's post-surgery functioning. (Id. at 365.) Dr. Falcone noted that he had been meeting with Claimant biweekly since the second surgery. (Id.) Dr. Falcone said that Claimant was able to walk, but not do full sports activities. (Id. at 368.) Further surgical options were also discussed. (Id. at 367.)

On April 12, 2011, Claimant visited Dr. Luis Cruz ("Dr. Cruz"), who works in physical medicine and rehabilitation. (Id. at 548-52.) Claimant reported to Dr. Cruz that he was experiencing severe pain in both feet. (Id.) Claimant also visited Dr. DePaola in May of 2011, reporting that he was in severe pain and had difficulty walking without the aid of a cane. (See id. at 372-77.) Claimant told Dr. DePaola that he used a cane for his ten-minute walk to school every day, because he would be ridiculed by his fellow classmates if he showed up to class in a

3

wheelchair. (Id. at 372-77.) Although he was trying to determine Claimant's ambulatory abilities, Dr. DePaola only evaluated Claimant while he was using his cane. (Id.)

A few months after the second surgery, Dr. Falcone examined Claimant and determined that he needed to have both surgeries reversed because the hardware inserted into Claimant's feet was cutting the skin, soft tissue, and possibly even the bone. (See id. at 503.) On July 21, 2011, Dr. Falcone performed a third surgery on Claimant, removing from both feet the hardware that had been inserted in the previous surgeries. (See id. at 520-22.) After completing the surgery, Dr. Falcone spoke to Plaintiff, informing her of further surgical options for Claimant, including calcaneal osteotomy (a controlled break of the heel to correct a deformity), and instructed Claimant to wear a surgical shoe and to use a cane. (See id. at 520, 522.)

Following Claimant's third and final surgery, Claimant visited Dr. DeMeo for a follow-up appointment on August 1, 2011. (See id. at 573.) Dr. DeMeo found that Claimant was walking without pain. (Id.) On August 5, 2011, Claimant visited Dr. Simon Raskin ("Dr. Raskin"), another associate of Dr. Falcone's, regarding the previous month's surgery. Claimant again reported no pain. (See id. at 576.) During a later visit to Dr. Cruz, Claimant reported pain in his left foot that worsened by walking on it. (See id. at 579-80.) After evaluating Claimant's foot, Dr. Cruz told Plaintiff that "her son will not be crippled, that his condition is common, and with proper maintenance of his feet, he will live a normal life!" (Id.)

Claimant saw Dr. DeMeo again on May 21, 2012. He reported that he had had pain in his left foot since the last operation, and that his left foot was unstable at times. (See id. at 589.) On June 18, 2012, Dr. Gray performed a consultative examination of Claimant. (Id. at 400-05.) Dr. Gray noted that Claimant was "unable to ambulate." (Id.) He explained that while Claimant used assistive devices, including braces and a walker, "it is still difficult for him to ambulate and

4

to be totally independent." (Id.) Later in his report, Dr. Gray noted that Claimant "would like to play [basketball], but is limited by his inability to balance." (Id.) Dr. Gray diagnosed Claimant with a congenital foot deformity, giving him a "guarded" prognosis. (Id.)[2]

### 4. Adjustment Disorder

On May 6, 2011, Dr. Christopher Flach ("Dr. Flach"), a licensed psychologist, performed a consultative examination of Claimant. (Id. at 378-80.) Dr. Flach diagnosed Claimant with adjustment disorder with mixed anxiety and depressed mood. (See id.) Claimant described to Dr. Flach problems with argumentativeness, as well as problems with attentiveness and concentration, but Dr. Flach found that Claimant's attention and concentration appeared adequate. (Id. at 378-79.) Dr. Flach diagnosed Claimant with a depressed affect and dysthymic mood. (Id. at 379.) Dr. Flach also noted that Claimant was able to complete age-appropriate tasks, and that he asked questions and requested assistance in an age-appropriate manner. (Id.) Claimant told Dr. Flach that he dressed and bathed himself. (Id. at 380.) However, Claimant did have some learning problems. (Id.) Dr. Flach recommended that Claimant consider individual or group counseling, but noted that the prognosis was good. (Id.)

Dr. Falcone, Dr. DePaola, Dr. Nejmeh-Khoury, and Dr. Gray all commented on Claimant's mental state in addition to the other ailments they investigated. On May 3, 2011, Dr. Falcone filled out a New York State Office of Temporary and Disability Assistance form, in which he noted that Claimant did not display any behavior suggestive of a significant psychiatric disorder. (See id. at 366.) In his consultative evaluation, Dr. DePaola reported that Claimant was "capable of all age-appropriate activities of daily living." (Id. at 374.) Dr. Nejmeh-Khoury,

---

[2] Dr. Falcone treated Claimant on August 5, 2011, and May 21, 2012, but in both cases he provided just a sentence in his report concerning Claimant, and in both instances, the writings were illegible. (See id. at 573, 589.)

noted that Claimant had behavioral problems while conducting a routine check-up. (See id. at 593.) Dr. Gray found that Claimant needed assistance with daily living activities, such as "feeding himself, dressing himself, and bathing." (Id. at 404.) Dr. Gray's prognosis for Claimant's depression was "guarded." (Id.)

### 5. Other Medical Evidence

On May 25, 2011, disability medical consultants Dr. S. Imam ("Dr. Imam") and Dr. R. Lopez ("Dr. Lopez") evaluated Claimant's functional equivalence domains.[3] They found that Claimant was not limited in the domains of "Acquiring and Using Information," "Attending and Completing Tasks," "Caring for Yourself," and "Health and Physical Well-Being." (Id. at 384-86.) They also found a less than marked limitation in the domains of "Interacting and Relating with Others," and "Moving About and Manipulating Objects." (Id.) Dr. Imam and Dr. Lopez did not believe that these impairments would last twelve months or longer. (Id.) The doctors analyzed Claimant's records—medical and otherwise. However, they made their findings without the aid of Claimant's Individualized Education Program ("IEP"), which had not yet been completed at the time of their consultation. (Id. at 18.)

### B. Other Evidence

#### 1. Report Card

Claimant's eighth grade report card shows that he experienced difficulty in school. (See id. at 286.) Claimant achieved a designation of "meets standard" in just one marking period of one class. (Id.) On the report card, numerous teachers note that he had the "ability to do better," was a "distractive influence in class," had "poor work habits," that he needed "to accept responsibility for learning," that he "d[id] not show self control," and that he was "inattentive."

---

[3] The first names of Dr. S. Imam and Dr. R. Lopez are not reflected in the Record.

(Id.) In the three assessment periods Claimant had completed by the date of the report card, his sample averages for each period were 63.75%, 61.50%, and 63.75%, respectively. (Id.)

### 2. Individualized Education Program

Allen Wolynez ("Mr. Wolynez"), a psychiatrist at Claimant's school, completed Claimant's IEP on June 29, 2012, just after Claimant finished eighth grade. (Id. at 303-18.) The IEP showed that Claimant passed his state education assessments in 2012, and that he had a Wechsler Intelligence Scale for Children IQ of 85, which placed him in the "low average" range. (Id. at 303.) However, Claimant was only in the sixth percentile in the Verbal Comprehension Index, comprehended words at a low-sixth grade level, wrote at a mid-fifth grade level, and performed math calculations at a low-fourth grade level. (Id.) Mr. Wolynez found that Claimant often argued with other students, and that he needed encouragement to stay on task. (See id. at 304.) The IEP recommended special education programming three times per week in Math, and twice per week in English/Language Arts. (Id. at 308.) The results also showed that Claimant had a tendency to give up easily on difficult tasks and needed encouragement in order to complete them. (See id. at 315.) The IEP also stated that Claimant was on the basketball team at school, "however [Claimant] said that it is more difficult to play since the surgeries he had on his feet." (Id. at 303.)

### 3. Function Report

Plaintiff completed a Social Security Function Report for children age 12-18 on March 22, 2011. (Id. at 236-45.) In the Report, Plaintiff noted that Claimant had vision issues, and indicated that Claimant could not walk, run, dance, swim, drive a car, ride a bike, throw a ball, jump rope, or play sports. (See id.) Plaintiff also stated that Claimant could take care of personal hygiene, wash and put away his clothes, and help around the house. (See id.)

7

### 4. New York State Office of Temporary and Disability Assistance Questionnaire

Plaintiff completed a questionnaire by the New York State Office of Temporary and Disability Assistance on April 1, 2011. (Id. at 257-59.) In the questionnaire, Plaintiff indicated that Claimant had "a limp like a cripple" and was often depressed. (See id.) Plaintiff also noted that she had not noticed any problems in self-care activities, e.g., using the bathroom, washing, feeding, and dressing. (Id.)

### 5. Claimant's Recent Medical Treatment Form

On the SSA's undated Recent Medical Treatment Form, Plaintiff indicated that Claimant did not visit any doctors since the previous form was filed because he missed too much school in the preceding months due to his foot surgeries.[4] (See id. at 278.) For the same reason, Claimant did not receive psychiatric therapy, as school hours "d[id] not allow it." (Id.)

### 6. Testimony

Plaintiff and Claimant appeared before Administrative Law Judge Margaret Donaghy on May 22, 2012, and August 28, 2012. (See id. at 43-56, 57-77.) Claimant testified that he could not walk every day because of his foot issues and that he needed a cane to move around. (See id. at 63.) He also testified that he was supposed to have braces for his feet, but that he used his mother's braces because the store did not take his family's insurance. (See id. at 66, 69.) Claimant denied playing any sports or participating in gym class because doing so made his feet worse. (Id. at 65.) Claimant also testified to having only two friends at school, and that the rest of the students teased him for his foot problems. (Id. at 64.) When he did go out with friends, he just sat in the park because he could not do anything else. (Id. at 65.) He testified that he had trouble with his homework because he simply did not understand much of the material. (See id.

---

[4] The Record does not indicate the date of the filing of the previous form.

8

at 64.) He further stated that he used to get counseling at school, but not any longer. (See id. at 66.)

At the hearing, Plaintiff testified that Claimant met with a school psychologist seven times, but there is no documentation of such meetings in the Record. (See id. at 51-52, 282.) Plaintiff stated that Claimant's meetings with the school psychologist stopped because "the man stopped coming to pick him up."[5] (Id. at 51.) The school psychologist's office recommended that Claimant see a doctor regularly outside of school, and Plaintiff scheduled an appointment for Claimant with a new psychologist in September 2012, the month following the hearing. (Id. at 51, 71.) Plaintiff testified that she was working to get Claimant speech therapy at school in an effort to improve his learning. (See id. at 68.) Plaintiff revealed that Claimant did not have his own prescription braces for his feet because her health insurance did not cover the costs. (See id. at 69.) Plaintiff stated that she knows that Claimant played "ball" with his friends, but he would not admit it out of fear that Plaintiff would be upset with him. (See id. at 70.) Plaintiff did not believe that Claimant was ever suspended from school, but confirmed that he had received detentions in the past. (See id. at 74.) Plaintiff believed Claimant could take care of his own hygiene, but stated she did many personal tasks for him, including washing him and dressing him, because his depression was so severe sometimes that he did not want to take care of himself. (See id. at 75-76.)

## II. PROCEDURAL HISTORY

On March 22, 2011, pro se Plaintiff filled out an application for Supplemental Security Income benefits on behalf of her son, a child under age eighteen, claiming that he had been disabled since March 1, 2011. (See id. at 157-63.) The application was denied on May 26, 2011.

---

[5] The testimony does not make clear the identity of "the man" referred to by Plaintiff.

9

(Id. at 79-83.) Plaintiff then requested a hearing before an ALJ, and the request was granted. (Id. at 85.) The hearings were held on May 22, 2012, and August 28, 2012. (Id. at 85, 41-56, 57-77.) The ALJ denied Plaintiff's application for SSI on September 19, 2012. (Id. at 11-24.) Plaintiff's request for a review of the decision was denied by the SSA's Appeals Council on December 27, 2013, and the ALJ's decision became final. (Id. at 1-5.)

On February 26, 2014, Plaintiff filed the instant pro se action seeking judicial review of the SSA's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. ¶¶ 1-2.) The Commissioner filed her Answer, along with the Administrative Record, on June 26, 2014. (See Answer (Dkt. 9); R.) On June 23, 2015, the Commissioner moved for judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c) and Local Civil Rule 12.1. (See Def.'s Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings (Dkt. 19).) Plaintiff neither responded nor separately moved. However, the court construes Plaintiff's letter dated September 28, 2014, requesting help for her son, as a cross-motion for judgment on the pleadings, and an opposition to Defendant's motion for judgment on the pleadings. (See May 21, 2015, Order; Sept. 28, 2014, Pl.'s Ltr.)

### III. LEGAL STANDARD

#### A. Review of Final Determination of the Social Security Administration

Under Federal Rule of Civil Procedure 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [he] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004

WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). However, the court must be mindful that, "[a] document filed pro se is to be liberally construed, and . . . must be held to less stringent standards than formal pleadings drafted by lawyers." Beye v. Colvin, No. 13-CV-5484 (DLI), 2016 WL 737905, at *10 n.5 (E.D.N.Y. Feb. 22, 2016) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)); see also Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010). Accordingly, courts construe a pro se plaintiff's pleadings and briefings "to raise the strongest arguments that they suggest." Beye, 2016 WL 737905, at *10 n.5 (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

### B. Determination of Disability

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The SSA applies a three-step analysis to determine whether a child of less than eighteen years is disabled. Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004). First, the child must not be engaging in substantially gainful activity. Id. If the child is engaged in substantial gainful activity, benefits are denied at this first step. Id. If the child is not engaging in substantially gainful activity, the SSA next assesses whether the child is suffering from a medically determinable impairment that is severe. Id.; 20 C.F.R. § 416.924(c). If there are no severe impairments, then benefits are denied at this second step. Pollard, 377 F.3d at 189. Should there be a severe impairment, the final step is to determine whether the impairment meets, medically equals, or functionally equals the SSA's Listing of Impairments. Id.; 20 C.F.R. § 416.924(d). If a claimant suffers from a severe impairment that meets, medically equals, or functionally equals the Listings of Impairments, and the severe impairment is expected to last twelve months or more, then benefits must be granted. Pollard, 377 F.3d at 189.

## IV. DISCUSSION

ALJ Donaghy found that Claimant: (1) had not engaged in substantial gainful activity since filing; (2) had severe impairments relating to pes planovalgus, asthma, and adjustment disorder; and (3) did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of one of the listed impairments. (R. at 14-15.) At issue before the court is whether the medical evidence in the Record was developed appropriately with regard to the treating physicians, and whether the ALJ properly weighed the opinions of the various physicians.

## A. Development of the Record

The court first analyzes whether ALJ Donaghy fulfilled her duty to compile a completed Record with all the requisite medical evidence in order to adequately scrutinize Claimant's disabilities. "[U]nlike a judge in a trial, [an ALJ] must . . . affirmatively develop the record [on behalf of the claimant]." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)). The ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (internal quotation marks omitted). This duty to develop the record is heightened where the claimant proceeds pro se. Lamay, 562 F.3d at 509. Specifically, an ALJ must "request medical source statements from a [claimant]'s treating sources . . . , regardless of whether [the] medical record otherwise appears complete." Pettaway v. Colvin, No. 12-CV-2914 (NGG), 2014 WL 2526617, at *5 (E.D.N.Y. June 4, 2014) (citation and internal quotation marks omitted). A treating source is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008); see also Schisler v. Bowen, 851 F.2d 43, 46 (2d Cir. 1988) (finding a treating source includes a claimant's psychologist). The opinions of a treating physician "is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). The obligation to pursue additional information from a claimant's treating sources is especially important where those records are "sparse" or "conclusory." Rosa v. Callahan, 168 F.3d 72, 79-80 (2d Cir. 1999). Gaps in a treating physician's report "does not mean that such [supplemental] support does not exist; he might not have provided this information in the report because he did not know that the ALJ

13

would consider it critical to the disposition of the case." Rosa, 168 F.3d at 80 (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)).

Here, numerous gaps in the Record exist as to two individuals who provided Claimant "with medical treatment or evaluation, and . . . who had an ongoing treatment and physician-patient relationship with [Claimant]." Sokol, 2008 WL 4899545, at *12. Dr. Falcone performed three surgeries on Claimant over an eight-month span, and met biweekly with Claimant for a period of time thereafter. (See R. at 357, 363, 365, 507.) As his surgeon, Dr. Falcone and his team[6] are likely intimately familiar with Claimant's foot problems, and had even suggested the possibility of further surgery to Plaintiff. (Id. at 520.) However, save for two illegible handwritten sentences, the Record is silent as to the opinions of Dr. Falcone and his team as to Claimant's foot conditions, and his name does not appear in the ALJ's 14-page decision. Considering Claimant's tortured medical history, where he underwent two surgeries to correct the flat foot conditions in his feet and a third to reverse the corrective surgeries, the ALJ should have sought additional medical source statements from Dr. Falcone to supplement the Record as to, among other things, the status of Claimant's foot conditions.

The Record is also insufficiently developed as to the seven sessions Claimant had with an unidentified school psychologist over a two-month period. (See id. at 51-52, 282.) The Record is silent as to the identity of the school psychologist, and is devoid of any documentation relating to these sessions. During the May 22, 2012, hearing, the ALJ stated that she would contact Ms. Peroit, a psychologist at Claimant's school, to determine the identity of the school psychologist who conducted the sessions. (See id. at 52.) However, no follow-up on this topic is present in the Record. The ALJ was obligated to investigate and complete the Record concerning these

---

[6] Dr. James DeMeo, Dr. Simon Raskin, and Dr. Tunde Osofisan are podiatrists who worked with Dr. Falcone at Interfaith Medical Center to treat Claimant's foot problems. (See, e.g., R. at 573, 576.)

14

psychotherapy sessions so as to better evaluate the extent of Claimant's adjustment disorder. The ALJ's failure to satisfy her affirmative duty to pursue additional information from Claimant's treating sources warrants a remand.

### B. New Individualized Education Program

On June 2, 2015, Plaintiff sought "permission to submit a new IEP," which she claims would aid in securing Supplemental Security Income benefits for Claimant. (June 2, 2015, Pl.'s Ltr. (Dkt. 15).) A court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence that is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Pollard, 377 F.3d at 193 (quoting 42 U.S.C. § 405(g)). "New evidence is 'material' if it is both (1) 'relevant to the claimant's condition during the time period for which benefits were denied' and (2) 'probative.'" Pollard, 377 F.3d 183, 193 (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)). "The concept of materiality requires . . . a reasonable possibility that new evidence would have influenced the [Commissioner] to decide claimant's application differently." Id. (quoting Tirado, 842 F.2d at 597). The burden is upon the movant to show that the proffered evidence should be considered. See Tirado, 842 F.2d at 597. Plaintiff simply has not met her burden. While she suggested in her letter that there is a "new IEP," she did not include the Individualized Education Program itself or any details about it. (June 2, 2015, Pl.'s Ltr.) It is unclear then, precisely when the IEP—an analysis of the current functioning of a student for a particular school year (see R. at 303)—was conducted, and for what time period it concerns. The court thus cannot determine whether the proffered evidence is

either new or material. Accordingly, the court will not order that it be considered by the Commissioner on remand.[7]

### C. Weight of Dr. Andre Gray's Opinion

The ALJ gave no weight to Dr. Gray's opinion that Claimant is markedly limited in his ability to participate in educational, social, and recreational activities (R. at 404), because "it is contradicted by the substantial medical evidence of the record, the claimant's own report, and the testimony of the claimant's mother." (Id. at 18). According the ALJ, Dr. Gray's opinion was not consistent with the rest of the Record because Dr. Gray found that Claimant had decreased visual acuity and had no ability to ambulate. (Id.) However, the ALJ's assertion that Dr. Gray's opinion is not in harmony with the rest of the Record is unfounded. First, Dr. Gray was not alone in discussing Claimant's visual deficiencies. The Record shows that Plaintiff testified before the ALJ that she was told her son would never see again after the trauma he suffered to his left eye. (Id. at 50.) On July 14, 2011, Claimant saw Dr. Gadangi, who noted a pale optic nerve in his left eye and referred him to another doctor for further inspection. (Id. at 565-66.) Furthermore, On May 22, 2012, Dr. Feig saw Claimant and diagnosed Claimant with traumatic optic neuropathy, prescribing Alphagan P 0.1 percent. (Id. at 284.)

The ALJ also takes Dr. Gray's comment that Claimant was unable to ambulate out of context. Dr. Gray did say Claimant was "unable to ambulate." However, he explained that Claimant's condition "is a permanent deformity and he has assistive devices, but it is still

---

[7] The court notes that if this new IEP was conducted after the ALJ's September 2012, decision, then it is unlikely to warrant consideration. While such an IEP would undoubtedly be new evidence and good cause would exist for Plaintiff's failure to incorporate it in the prior preceding, it likely would not be material. See Pollard, 377 F.3d at 193 (finding evidence was new and good cause existed where evidence "did not exist at the time of the ALJ's hearing"). However, because an IEP is an analysis of current functioning, one conducted after the ALJ's decision would contain assessments of Claimant's functioning for a time that is after the decision. Such an IEP would not be relevant to the time period for which the ALJ denied SSI benefits. See, e.g., Johnson v. Astrue, 563 F. Supp. 2d 444, 461 (S.D.N.Y. 2008) (stating that new behavioral information from a school year after the one in which the ALJ made a ruling is not material).

16

difficult for him to ambulate and to be totally independent." (Id. at 404.) It appears that Dr. Gray meant merely that Claimant cannot walk without an assistive device, like the cane, braces, or walker he had been using when he presented to all of the other doctors. The ALJ is entitled to weigh the opinions of different physicians as appropriate, but ALJ Donaghy's reasons for affording Dr. Gray's opinion zero weight are not supported by the Record. The court finds that the ALJ improperly weighed the medical evidence before her, and therefore remands the case for a proper evaluation of the medical opinions.

## V. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is DENIED, the Plaintiff's cross-motion for judgment on the pleadings is GRANTED, and this case is REMANDED to the SSA for further development of the Record and a proper evaluation of the medical opinions.

SO ORDERED.

Dated: Brooklyn, New York
August 10, 2016

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

17